UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
ADAM WIERCINSKI,

                Plaintiff,

      -against-                         MEMORANDUM AND ORDER
                                            09 CV 4413 (ILG)
MANGIA 57, INC., et al.,

                Defendants.
-----------------------------------------------x
GLASSER, United States District Judge:

      The plaintiff ("Wiercinski") filed a 28 page complaint on October 14, 2009, Dkt.

No. 1, alleging 12 causes of action in 119 paragraphs, against corporate defendant

Mangia 57 and six individual defendants, namely, Sasha Muniak, Margaret Cymanow,

Grzegorz Sarosiek, Arthur Zbozien, Robert Bazgier and Dariusz Maslanka.  Charged

against all, jointly and severally, are violations of 42 U.S.C. § § 2000e et seq., 1981, 1985,

1986 (Title VII), claiming disparate treatment based on religion and national origin;

retaliation, conspiracy, unlawful discharge and violation of NYSHRL and NYCHRL.

      The litigation history reflected in a docket sheet of 165 entries embraced a motion

to dismiss that complaint, Dkt. No. 12, and a Memorandum and Order ("M&O"), Dkt.

No. 19, familiarity with which is assumed, granting the motion as based upon the New

York State and New York City Human Rights laws, but denying it as regards the federal

claims.  Extensive pretrial activity presided over by Magistrate Judge Orenstein during

the next few years led to a Stipulation of Partial Dismissal With Prejudice filed on

November 29, 2011, Dkt. No. 80, by the terms of which all individual defendants were

dismissed and all causes of action were dismissed excepting the Title VII claim for

hostile work environment based on religion and hostile work environment based on

ancestry/ethnicity pursuant to 42 U.S.C. § 1981.

On January 20, 2012, a motion for summary judgment was filed by Mangia 57, the only remaining defendant.  Dkt. No. 83.  In a M&O dated June 18, 2012, Dkt. No. 91, the motion was granted as to the Title VII claims and denied as to the § 1981 claim. After approximately 17 months of seemingly never-ending pretrial stumbling over one obstacle or another, a jury was selected and the trial commenced on October 21 and concluded on October 23, 2013.  The jury returned a verdict finding supervisor responsibility for a hostile work environment for which the defendant employer was held liable and awarded plaintiff no compensatory damages, nominal damages of $1 and punitive damages in the amount of $900,000.

Pending before the Court is defendant's motion seeking an Order pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure "remitting the jury's punitive damage award and/or for a new trial on punitive damages, and/or for a judgment notwithstanding the verdict that vacates the punitive damages award in its entirety and for such other and further relief as the Court should deem appropriate."  Dkt. No. 163.

## **Background**

The facts briefly stated are that the plaintiff, who is Jewish, Tr. at 21, was employed by the defendant as a deliveryman from 1999–2007.  The defendant ("Mangia") is a caterer who prepares food ordered by employees in surrounding office buildings which is then delivered to them by defendant's employees, deliverymen such as the plaintiff.  In addition to their salaries, deliverymen receive tips from the customers to whom the orders are delivered.  The tips constitute a significant part of their earnings.  A manager in charge of a work-shift assigns to the deliveryman orders to

be delivered. The size of the order bears upon the amount of the tip which, in total on any given day, can exceed one's hourly pay and is usually the main source of the deliveryman's earnings. Among the nine witnesses who testified (4 for the plaintiff and 5 for the defendant), the principal protagonists, besides the plaintiff, were Arthur Zbozien ("Zbozien"), the night shift manager, Tr. at 35, and Margaret Cymanow ("Cymanow"), the general manager of Mangia, Tr. at 210.

The plaintiff's case hinged, essentially, on his telling of the incriminating events and on the testimony of three former co-workers. His telling of it was a recitation of anti-Semitic epithets and vulgarities, which, he testified, were spewed at him continually by Zbozien during the entire eight years of his employment at Mangia. Those epithets were alleged in his complaint in paragraphs 39–45 and repeatedly recounted by him on his direct examination. Among them were "you m–f-ing jew," "stinking jew," "dirty jew," "Jewish pederast," "dumb jew," "kike." In addition, two specific events were recalled in furtherance of his claimed hostile environment and offered as emblematic of it. The first occurred on the very first day of his employment at Mangia. While carrying boxes, he accidently bumped into Zbozien, who angrily turned on him and said, "did anybody every f. . . you up, you stupid f-ing jew." Tr. at 34. The second incident occurred at the end of a shift when, as related in the complaint more coherently than in the testimony, employees lined up at a cash register to account for monies received from customers of food orders and to receive the tips as indicated on the bills. Mr. Zbozien generally sat at the register. When the plaintiff's turn to account came, Zbozien stood up and said he is not "going to deal with this f-ing jew." If what was due in tips to the plaintiff was less than a dollar, Zbozien would pay part of it in pennies that were thrown

at him.  Tr. 36–38.  Repetition of these vile, anti-Semitic slurs aimed at him was elicited throughout his direct examination as were his assertions that he repeatedly complained about them to Ms. Cymanow, who ignored them and who he also gratuitously labeled as a "known anti-Semite."  Tr. 65–66.  His explanation for having stayed so long in the defendant's employ and endured his claimed abuse was that he was afraid of not finding another job if he left or got fired.  Tr. 58.  The effect of the abuse he endured was sleep disorder and depression for which he sought psychiatric help, Tr. 60, but called no mental health provider to support his claim.

Telling in this regard, however, is his initial denial that he asked his therapist if she could tie his emotional injury to his lawsuit.  When then shown a document to refresh his recollection that he did make that request of her, his response was, "If I said so, it's in writing, it <u>may</u> have happened."  Tr. at 99 (emphasis mine).

The Court is impelled to set out at some length, portions of the cross-examination of this witness which can only be seen as casting an ominous shadow on the tale he told on his direct examination.  The very first question put to him presaged what was to follow and represented the brazen essence of his testimony.

> Q:      Mr. Wiercinski, when you were working at Mangia, did you get paid using a different name?
>
> A:      At this time, I would like to ask the jury and Your Honor to permit me to use the Fifth Amendment because I believe that to answer this question it may incriminate me.
>
> THE COURT:      What was the answer to that question?  Would you repeat it.
>
> THE WITNESS:      At this time, I would like to seek the right to hide behind the Fifth Amendment, and I respectfully decline to answer this question on the ground it may

4

incriminate me.

Tr. at 66–67.

* * *

Q: Mr. Wiercinski, did you get paid under a different name in order to conceal income from the United States government?

A: At this time, Your Honor and members of the jury, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer the question on the ground it may incriminate me.

Q: Finally, on that particular issue, did you conceal – did you desire to conceal your income from the United States Government so that you could obtain benefits from the Social Security system that you were not entitled to?

A: Your Honor and members of the jury, at this time I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground it may incriminate me.

Tr. at 67–68.

Q: Mr. Wiercinski, do you recall providing sworn testimony at an administrative hearing related to this litigation?

A: At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Tr. at 68.

Q: I would like to read to you, Mr. Wiercinski, your answer to these questions from that administrative hearing. Page 196, line 9:

"QUESTION: " ---

THE COURT: Excuse me. Before you get to that, do I understand that you are asserting your Fifth Amendment right to respond whether you were or were not deposed at a prior occasion? Is that what you are taking the Fifth Amendment to?

THE WITNESS: Yes.

Tr. at 68–69.

Q:     (Reading)

           "QUESTION:        And what name did you give to Mangia to pay you
                            under?

           ANSWER:          I was giving Adam Jamroz.

           QUESTION:        Is there an Adam Jamroz?

           ANSWER:          Yes.  He is a cousin.  He is no longer with us because
                            he is not in the country anymore, but I used his name.
                            Because, we, in 1991 opened a joint account together
                            when he was with me, and we used to deposit money
                            in that account.  So when the account was opened I
                            called Martha and she said, you know, no problem
                            with that."

           Do you recall that testimony?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment
       and respectfully decline to answer this question on the ground it may
       incriminate me.

Tr. at 69.

                              *     *     *

Q:     Mr. Wiercinski, in that same proceeding which you were under oath, did
       you provide this answer to this question.  It was a question by the Court in
       that case:

           "THE COURT:       So your purpose was to have the income shown in
                            someone else's name so that the governmental agency
                            wouldn't know that you were making that income?

           THE WITNESS:       Uh-huh.

           THE COURT:        "Yes?"

           THE WITNESS:      Yes, yes."

           Do you recall that question and that answer that you provided at this
           proceeding?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment

                                     6

and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     This is the final question that I have for you on this issue, Mr. Wiercinski. And I understand how you responded to these questions, but the final question on the Social Security issue is this. How much did you receive in Social Security benefits while you were receiving income under the name of Adam Jamroz at Mangia?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and actually decline to answer this question on the ground that it may incriminate me.

Tr. at 71–72.

* * *

Q:     Mr. Wiercinski, in the year 2006 you filed a tax return with the U.S. Government, is that correct?

A:     I do not recall.

And after being shown the relevant document:

Q:     Mr. Wiercinski, does that refresh your recollection that you filed a return in 2006?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer the question on the ground that it may incriminate me.

Q:     Did you report your Mangia income in 2006 to the United States Government?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Mr. Wiercinski, rather than ask you a separate question for each of the successive years, I am going to ask you, do you recall filing returns for 2008, 2009, and 2010?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:      Finally, on this topic, Mr. Wiercinski, for those years, 2008, 2009 and
        2010, did you report your income, your Mangia income to the United
        States Government?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer this question on the ground that it may
        incriminate me.

Q:      In your early years at Mangia when you were working full-time in Mangia,
        and I am asking now separate and apart from the Social Security issues,
        did you receive public assistance?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer the question on the ground that it may
        incriminate me.

Q:      The final question on this issue. At that time, were you working under and
        were you receiving your wages under the name, the fictitious name, Adam
        Jamroz to conceal your income so you could obtain the public benefit?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer the question on the ground that it may
        incriminate me.

Tr. at 76–77.

*   *   *

Q:      So the discrimination, Mr. Wiercinski, began – we now know began in 19 –
        according to your testimony, your narrative, began in 1999 with Mr.
        Lipski. You didn't complain about that. You were fired and rehired,
        correct?

A:      Yes.

Q:      And then it continued at the other location, the other Mangia location by
        Mr. Zbozien, correct?

A:      Yes.

Q:      Mr. Bazgier also said things to you, correct?

A:      Yes.

Q:      Mr. Lipski?

8

A:    Mr. Lipski was not associated with Mangia 57.

Q:    Mr. Sarosiek?

A:    Yes.

Q:    And Ms. Simmons, correct?

Q:    And all this time you continued to work at Mangia?

A:    Yes.

Q:    And you said, I think, on questioning from your atorney, that you needed a job, correct?

A:    I needed security.

Q:    But you also didn't – Mr. Wiercinski, all these years of harassment that you're claiming went from 1999 all the way up to 2007, correct, eight years of what you're claiming was this constant abuse, you never looked for another job, did you?

A:    At this time I would like to respectfully decline to answer this question on the ground that it may incriminate me.

Q:    After you left – after, ultimately, you left in 2008, Mr. Wiercinski, when you went – sometime in 2008 you went home to Poland, correct?

A:    Yes.

Q:    And then you wanted to come back to Mangia, correct?

A:    Yes.

Q:    Even then you wanted to come back to Mangia and work there as late as 2007, despite all the harassment that occurred, all of this abuse that you're claiming occurred, is that right?

A:    Yes.

Q:    In fact, you weren't allowed back.  That's your testimony, correct?

A:    Yes.

Q:    You then went to work after you left at a restaurant called Cucina.

A:     At this time, I would like to seek refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Again, you remember testifying, Mr. Wiercinski, at a hearing, correct?

A:     Yes.

Q:     Is that correct?

A:     Yes.

Q:     I'm going to ask if you recall this question and this answer, page 207, line 25:

       "QUESTION: Now, after not being rehired by Mangia 57, what did you do for a living?

       ANSWER:  Well, I went to the location Cucina that occupied the Mangia 56 location when Cucina took over.  And I asked for a job.  and they hired me, you know, for a couple – for approximately March 2008 until I left."

       You answered that question at the hearing.

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Are you seeking that refuge because you continued, during that time, to hide the Cucina income from the United States Government?

MR. MORIARTY:     Objection.

THE COURT:        Overruled.

A:     At this time, I would like to seek the refuge behind the Fifth Amendment on the grounds that it may incriminate me.

Q:     You were seeking to hide the income at that time when your worked at Cucina because you were obtaining Social Security benefits to which you were not entitled, correct?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Tr. at 93−96.

* * *

Q:     While you are looking at 20, also look at 21.  I have one question about those documents.  Did you actually, Mr. Wiercinski, submit written information about yourself to the Social Security Administration in support of your application for benefits?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Was that information, Mr. Wiercinski, false?  The information you gave to Social Security was a narrative of your life that was false, is that correct?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Did Adam Jamroz ever loan you money?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     That was false, was it not?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     You communicated to the Social Security Administration that information, meaning, that Adam Jamroz had loaned you money and that Adam Jamroz was suing you to get it back, all of that is false, correct?

A:     At this time, I would like to seek the refuge behind the Fifth Amendment and respectfully decline to answer this question on the ground that it may incriminate me.

Q:     Immigration never submitted documents in the name of Adam Jamroz to the Immigration Naturalization Service?

A:     No.

Q:      Did you ever sign Adam Jamroz's name to a document that went to the
        INS?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer this question on the ground that it may
        incriminate me.

Q:      When you signed his name, you knew you were submittin a document to
        the INS that was forged?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer this question on the ground that it may
        incriminate me.

Tr. at 97–98.

Q:      Do you know who Adam Bass is?

A:      At this time, I would like to seek the refuge behind the Fifth Amendment
        and respectfully decline to answer that question on the ground that it may
        incriminate me.

Q:      In 2002, Mr. Wiercinski, were you transferred to the night shift at
        Mangia?

A:      I believe this is what happened, although I don't remember exactly the
        date.

THE COURT:          Is the answer yes?

THE WITNESS:        Yes.

Q:      When you were transferred, you asked for that transfer, correct?

A:      Yes.

Q:      You asked for that transfer in 2002 despite the fact that Mr. Zbozien was
        working that shift?

A:      Yes.

Q:      At this point, Mr. Zbozien had, according to you, already subjected you to
        years of harassment, correct?

A:      Yes.

Q:      But you still wanted to be transferred to his night shift, correct?

A:      Yes.

Tr. at 100–101.

At the end of the trial, the jury returned the following verdict:

Question # 1: Hostile Work Environment

Did the plaintiff prove, by a preponderance of the evidence, that he was subjected to an unlawful hostile work environment based on his Jewish ancestry and ethnicity, perpetrated either by his supervisor(s) and/or co-worker(s), during his employment with Mangia 57?

Perpetrated by supervisor(s)               Yes  X         No _____

Perpetrated by co-worker(s)                Yes_____       No X____

Question #2: Employer Liability for Supervisory Harassment

Answer this question ONLY if you answered "yes" for supervisor(s) under Question #1.

Did the defendant prove, by a preponderance of the evidence, both (1) that it exercised reasonable care to prevent and correct promptly the harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the defendant? A "yes" answer means that the defendant will not be liable for the supervisory harassment; a "no" answer means that the defendant will be liable.

                                           Yes_____      No  X____

Question #4: Compensatory Damages

Did the plaintiff prove, by a preponderance of the evidence, that he was harmed as a proximate result of being subjected to an unlawful hostile work environment based on his Jewish ancestry and ethnicity during his employment with Mangia 57?

Compensatory Damages                       Yes_____      No  X____

If, and only if, you answered "no" above, you may award the plaintiff nominal or symbolic damages in the amount of one dollar ($1). You may not award the plaintiff nominal damages if you decided to award him compensatory damages.

Amount of Nominal Damages                  $  1-_____

Question #5: Punitive Damages

Did the plaintiff prove, by a preponderance of the evidence, that a management official of the defendant — someone who exercised significant supervisory responsibility and decision-making authority — acted with "malice" or "reckless indifference" to the plaintiffs federally protected rights?

Malice or Reckless Indifference                    Yes  X          No____

If, and only if, you answered "yes" above, you may award the plaintiff an amount of money for punitive damages that you believe is necessary to punish the defendant for its wrongful conduct and/or to deter or prevent the defendant and other persons from engaging in similar wrongful conduct in the future. If you decide to award the plaintiff punitive damages, please list the dollar amount of such punitive damages in the space provided.

Amount of Punitive Damages                    $  900,000 - _____

## **Discussion**

### A.    Motion Pursuant to Rule 50(b) Federal Rules of Civil Procedure

Rule 50 provides in essence that a court may grant a motion as a matter of law notwithstanding the verdict if it finds that a reasonable jury did not have a legally sufficient basis to find for the claimant.  The standard to be observed in deciding that motion has been described in various formulations.  One of those is stated in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) as follows: "[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence in the record.  In doing so, however, the court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence."  That formulation was adopted verbatim by this Circuit in Harris v. Niagra Mohawk Power Corp., 252 F.3d 592, 597 (2d Cir. 2001), and in other iterations, see, e.g., Fairbrother v. Morrison, 412 F.3d 39, 48 (2d Cir. 2005).

Immediately following the quotation from Sanderson and in one form or another in decisions of this Circuit is this passage: "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court shall give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached at least to the extent that the evidence comes from disinterested witnesses," *supra* at 150–51 (emphasis mine).  I have, on a previous occasion commented on "The difficulties thus presented for the nisi prius judge."  In giving credence to evidence of the non-moving party is the court making credibility determinations that are "jury functions and not those of a judge?"  In proclaiming that the court "must disregard all evidence favorable to the moving party" how is a determination of evidence as favorable made without considering credibility?  What evidence is a jury not required to believe assuming that a jury is required to believe any evidence other than that to which the parties have stipulated?  Gottlieb v. Carnival Corp., No. 04 CV 4202(ILG)(VP), 2011 WL 7046904, at *1 (E.D.N.Y. Feb. 1, 2011).

Two brief excerpts from Fairbrother, *supra*, are emblematic of that difficulty, viz;

> The motion should be granted only if [the court] can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party a reasonable juror would have been compelled to accept the view of the moving party.  (emphasis mine).

> The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.  (emphasis mine).

411 F.3d at 48.

In <u>Gottlieb</u>, *supra* at *2, the Court also wrote:

> It is interesting to note that *Sanderson* did not make any reference to *Neely v. Martin K. Eby Construction Co., Inc.*, 386 U.S. 317, 325, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), characterized as the "Court's pathmarking opinion" in *Weisgram v. Marley Company*, 528 U.S. 440, 443, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000), which concerned "the respective authority of federal trial and appellate courts to decide whether, as a matter of law, judgment should be entered in favor of the loser."  In deciding that issue, the Court wrote, it "is guided by Federal Rule of Civil Procedure 50, which governs the entry of judgment as a matter of law, and by the Court's pathmarking decision in *Neely* which "teaches courts of appeals should 'be constantly alert' to 'the trial judge's firsthand knowledge of witnesses, testimony and issues;' in other words, appellate courts should give due consideration to the first-instance-decisionmaker's 'feel' for the overall case . . . .

The observation made by the Court in <u>Weisgram</u> echoes that made in a most-oft

cited case in this regard, <u>Cone v. West Virginia Pulp & Paper Co.</u>, 330 U.S. 212, 215–216

(1947), where the Court wrote:

> Rule 50(b) . . . does not compel a judge to enter a judgment notwithstanding the verdict instead of ordering a new trial; it permits him to exercise a discretion to choose between the two alternatives . . . .  His appraisal of the bona fides of the claims asserted by the litigants is of great value in reaching a conclusion as to whether a new trial should be granted. <u>Determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and had the feel of the case which no appellate printed transcript can impart</u>.  Exercise of this discretion presents the trial judge an opportunity . . . to view the proceedings in a perspective peculiarly available to him alone.  (emphasis mine).

<u>See</u> <u>also</u>, among many others, <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 546

U.S. 394, 402 (2006) ("because Rule 50(b) permits the district court to exercise its discretion to choose between ordering a new trial and entering judgment, its 'appraisal of the bona fides of the claims asserted by the litigants is of great value in reaching a conclusion as to whether a new trial should be granted.'"); Globe Liquor Co. v. San Roman, 332 U.S. 571, 574 (1948).

Having seen and heard the witnesses and having a firm hold on and not merely a feel, for every jot and tittle of this case, I am driven to the determination that a judgment entered for the defendant pursuant to Rule 50(b) notwithstanding the verdict, is the only determination that reasonable and fair-minded persons could arrive at and to do less would be to endorse a gross miscarriage of justice. Who are the witnesses who I saw and heard that drive me to that conclusion?

The Plaintiff Adam Wiercinski

I have set out in detail portions of Wiercinski's testimony which includes his persistent, and questionable, assertions of his Fifth Amendment privilege and portions of his testimony, the "feel" of which is virtually palpable merely seeing it on the printed page. It was his testimony upon which the case rested. A judicious determination of this Rule 50(b) motion compels a meaningful consideration of his assertions of privilege which strikes at the heart of the case.

The Court is mindful that pursuant to Federal Rule of Evidence 608(b), the plaintiff who chose to testify did not waive his privilege as regards questions directed to matters not testified to on his direct examination, but were aimed instead at his

credibility.[1]  He does, however, waive the privilege where, although beyond the scope of direct, the inquiry touches upon conduct that bears some relation to the merits of the case.  See, e.g., United States v. Spinelli, 551 F.3d 159, 167 (2d Cir. 1996); United States v. Cardillo, 316 F.2d 606, 611 (2d Cir. 1963).  In this case, where the defendant must prove a negative to prevail, the merits of the case rest entirely on credibility.  The observation of Justice Frankfurter in Brown v. United States, 356 U.S. 148, 154–56 (1958), is exquisitely apposite here and merits more than an abbreviated excerpt:

> If he [the defendant in a criminal case] takes the stand and testifies in his own defense his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross examination.  He has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.

> *   *   *

> The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry.  Such a witness has the choice, after weighing the privileges against self incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all.  He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross examination of the matters he himself put in dispute.  It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure, but a possible invitation to mutilate the truth a party offers to tell.  [T]here is hardly justification

---

[1] Rule 608(b) provides in relevant part that "By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness."  The Advisory Committee notes of the 2003 Amendment relate that "character for truthfulness" was substituted for "credibility" in the last sentence of subdivision (b).  That there is a meaningful legal distinction between "character for truthfulness" and "credibility" calls for a discussion which, although interesting, would unduly burden this opinion.  Insightful discussion of that issue is to be found in Uviller, Evidence of Character to Prove Conduct:  Illusion, Illogic and Injustice in the Courtroom, 130 U. Pa. L. Rev. 845 (1982), and Uviller, Credence, Character and the Rules of Evidence: Seeing Through the Liar's Tale, 42 Duke, L. J. 776 (1993).

for letting the defendant affirmatively resort to perjurious testimony in reliance on the government's inability to challenge his credibility.  <u>The interest of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of consideration determining the scope and limits of the privilege against self-incrimination</u>.  (internal citations omitted, emphasis mine.)

Judge Leval echoed that verity in <u>Spinelli,</u> *supra*, as follows: "A witness may not pick and choose what aspect of a subject to discuss; if allowed to draw the boundaries of his testimony any place he chooses [he] would be able to distort the facts."  531 F.3d at 167.

The observations in <u>Brown</u> and <u>Spinelli</u>, the Court is aware, were made in the context of a criminal case where the liberty of the defendant understandably weighs in the balance of the ascertainment of truth and the scope and limits of the privilege against self incrimination.  If, indeed as Justice Frankfurter so pointedly put it, it is the "function of courts of justice to ascertain the truth," the balance should plainly weigh more heavily in the discharge of that function in a civil case where guilt or innocence, liberty or prison, is not at stake.  <u>See</u> Heidt, The Conjurer's Circle - The Fifth Amendment Privilege in Civil Cases, 91 Yale L. J. 1062, 1083 (1982) ("The policies that the privilege has been said to promote apply with less force in civil cases than in criminal cases.").  What is at stake for this defendant is not a money judgment, but what is infinitely more important, its reputation.[2]  To be branded a hateful, bigoted anti-Semite by facts distorted by the indiscriminate abuse of a privilege is to suffer a fundamental

---

[2] A truism incomparably put by Shakespeare in Othello, Act 3, Scene 2: "Who steals my purse steals trash . . . . But he that filches from me my good name, robs me of that which makes me poor indeed."

unfairness.  Wiercinski voluntarily chose to testify.  In making that election he put his

persona, his credibility, before the jury.  A meaningful pursuit of the truth would permit

a jury to know who Adam Wiercinski is.  Is his § 1981 claim of harassment part of a

common scheme or plan, of a piece with questionably obtained social security benefits,

public assistance benefits and federal tax returns?  <u>See</u> Fed. R. Evid. 404(b).

An affirmation of the privilege inviolate in this case is to portray the mythical lady

slyly winking as she holds the unbalanced scales of justice and to emasculate the time-

honored understanding that a person places his credibility in issue when he elects to

testify.  The pregnant question is permitted to be asked, but the answer is aborted and

ameliorated by permitting the jury to infer that the answer, if permitted, would have

been unfavorable to the witness.  One may reasonably ask what inference other than an

unfavorable one could a reasonable person possibly draw and whether permitting the

question to be asked at all is a tacit acknowledgment of the inherent unfairness of

permitting the witness to "draw the boundaries of his testimony."  The Mechanistic

acceptance of the privilege undermines the ultimate objective of the trial's capacity to

ascertain the truth.[3]

Stunningly apposite is this additional observation made by Justice Frankfurter at

p. 156, n.5 in <u>Brown</u>, *supra*:

> Striking the witness' testimony or relying on the trier of fact
> to take into account <u>the obvious unfairness</u> of allowing the
> witness to escape cross-examination, must often in practice
> be poor substitutes for a positive showing under searching
> cross-examination that the testimony is in fact false.
> (emphasis added).

---

[3] It also lends credence to Mr. Bumble's irreverent but not wholly irrelevant pronouncement, "If
the law supposes that 'the law is a ass'" Dickens, Oliver Twist.

How was the defendant, Mangia, to effectively shield itself against Wiercinski's accusations that it was indifferent to the malignant environment he portrayed and in which he nevertheless continued to work and asked to be returned, except by emphatically denying it and attempting to convincingly establish he is not worthy of belief. It would burden this opinion unduly to assemble every transcript colloquy that has an illuminating bearing on truthfulness. The importance of this case, however, make some that are revealing deserving of notice.

Regarding Zelmanovitch - Wiercinski on direct examination:

> Q:     How did you come about that job at Mangia Wall Street?
>
> A:     . . . I contacted Zindel Zelmanovitch . . . . Since he sponsored me . . .. and he called Sasha right away[4] . . . . That's how I got the job.

Tr. at 29.

> A:     I spoke with Zindel Zelmanovitch again, and he spoke with Sasha Muniak, and I guess Sasha asked him to talk to his sister, and that's how I got the job.

Tr. at 30.

Wiercinski on cross-examination:

> Q:     Now, when you were fired, you went to Mr. Zelmanovitch, right?
>
> A:     Yes.
>
> Q:     He was a friend of yours, correct?
>
> A:     No, he was not.

---

[4] Sasha Muniak, the owner of Mangia.

Q:  He was someone who helped settle you in the United States when you came from Poland, right?

A:  Yes.

Q:  Mr. Zelmanovitch is an Orthodox Jew?

A:  I really do not know.

Q:  You know he's Jewish?

A:  Yes.

Q:  He wears an yarmulke?

A:  Yes.

Q:  Mr. Zelmanovitch is someone you went to from time-to-time seeking advice?

A:  I don't recall really. . . .

Q:  Is your testimony that you did not go to Mr. Zelmanovitch seeking advice about work issues, about life issues?

A:  No.  I don't recall going to him for that.

Q:  Well, you went to him when you were fired from Mangia, correct?

A:  Yes.

Q:  That was a work issue, correct?

A:  Yes.

Q:  You sought Mr. Zelmanovitch's intervention on your behalf to get your job back, correct?

A:  Yes.

Q:  So that was an incident where a work issue happened. You were fired, right?

A: Yes.

Q: You went to Mr. Zelmanovitch, and he advocated for you to get your job back, correct?

A: Yes.

Q: You're saying that was the only instance you can recall in which you sought his personal assistance or advice?

A: Yes, I think so.

Q: There was no other time that you went to him?

A: I don't recall.

Q: Well, you don't recall you went to him when you were fired for a reason you believed was for discrimination, right, by a guy who called you a little Jew? And you don't recall what you told Mr. Zelmanovitch, who is, himself, Jewish, that you were discriminated against while you were at Mangia?

A: I might have said it to him. I don't remember. It was ten years ago. I am sorry.

Tr. at 90–92

Zelmanovitch on direct examination:

Q: And when did you first meet Mr. Wiercinski?

A: Early '80s . . . when I was working with refugee resettlement agency in Brooklyn . . . . The agency was helping him to resettle in the United States. I was basically his coordinator. So I know – I know Adam more than 25 years.

Q: Have you – over that 25 years has Mr. Wiercinski come to you seeking advice?

A: Yes . . . . He always came to me with any problems he had in his life. Basically my door was opened through all 25 years for Adam to come and talk any life problem that he ever had.

Tr. at 174–75.

> Q: Did Mr. Wiercinski come to you on other occasions about work issues?

> A: Yes, he did.

Tr. at 176.

> Q: Mr. Zelmanovitch, on any occasion did Mr. Wiercinski communicate to you that he had been subject of anti-Semitism of any kind while he worked at Mangia?

> A: No.

> Q: He never –

> A: Let me state it that if Adam would ever indicate it to me, that Mangia or Sasha expressing anti-Semitism to him, I give you my word I would have involved in that.

Tr. at 178.

> Q: Did he ever mention a gentleman by the name of Artur Zbozien?

> A: Who?

> Q: Artur Zbozien.

> A: No.

> Q: So he never told you that Mr. Zbozien directed anti-Semitic remarks to him?

> A: No.

> Q: Did he say anything about his supervisors saying religiously derogatory things to him –

> A: No.

> Q: If he had come to you, Mr. Zelmanovitch, given your relationship with Mr. Wiercinski, if he had come to you with that kind of information, what would you have done?

A: I would confront Sasha and confront Mangia, but you have to understand who Sasha and Mangia is. Fifteen years ago Sasha invited me to watch a movie in his office, okay. And the movie was about Baal Shem Tov. Now, imagine, I mean, I almost flipped out. You have here a Catholic guy who paid for – who paid for a TV crew, cameras to go and make a movie about the Jewish man who started the Hasidic movement in the late 1760s in Mezeritch, Ukraine.

Now, that, the fact that somebody like Sasha could be anti-Semitic, it's just preposterous.

Tr. at 179–80.

And regarding Cymanow - Wiercinski on direct examination:

A: I complained to Margaret on several occasions . . . .

Tr. at 46.

Q: Now, you knew – you were friends with Ms. Cymanow, correct?

A: Not really . . . . I wasn't a friend. I knew her.

Tr. at 83.

Q: So, you had, from time-to-time, socialized with Ms. Cymanow and her husband, correct?

A: Not really. It wasn't socializing. I was just a visiting. I was with the friend who was the friend to Cymanows.

Tr. at 84.

Cymanow on direct examination:

Q: How did you first come to know Mr. Wiercinski?

A: In – around 30 years ago, Mr. Wiercinski, Adam, he was a friend of my husband.

Q: And did you socialize with Mr. Weircinski?

A: Yes, we do. I invite him to my home with any holidays, Christmas, other birthdays. Our family was

25

friends with him.

Tr. at 211.

> Q: Now, Ms. Cymanow, at any time, at any time, did you on any occasion direct an anti-Semitic remark of any kind towards Adam Wiercinski?

> A: Never in my life. My great grandmother is a Jew, was a Jew. Most of her family die in Holocaust. How can I? Never.

*   *   *

> Q: Have you, on any occasion, witnessed a Mangia employee or manager directing an anti-Semitic remark at Adam Wiercinski?

> A: No, no.

> Q: On any occasion, did you witness any Mangia employee or manager directing an anti-Semitic remark at anyone?

> A: No, not ever.

Tr. at 212–13.

> Q: And did on any occasion in particular you notice, witness, observe Mr. Zbozien directing anti-Semitic remarks at Mr. Wiercinski?

> A: No.

> Q: At some point, did Mr. Wiercinski come and complain to you about Mr. Zbozien?

> A: Yes, he did. He come. He complain to me. But his complaint was about money, that he's not making enough money.

Tr. at 214.

Cross examination of Mr. Zelmanovitch and Ms. Cymanow failed to cast the

faintest doubt on the truthfulness of their testimony. Scott Furman, an observant Jew who once worked for the defendant for seven years, also testified on behalf of the defendant. Tr. 220–29. His unimpeached, uncontradicted testimony was consistent with the testimony of Mr. Zelmanovitch and Ms. Cymanow.

Zelmanovitch and Furman were unimpeached and uncontradicted disinterested[5] witnesses and to whose testimony I give credence. See Sanderson, *supra*; In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009); Cameron v. City of New York, 598 F.3d 50, 60 (2d Cir. 2010), ("we 'give credence to . . . that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'") (quoting Sanderson).

In addition to the plaintiff himself, three witnesses were called on his behalf. They were former employees and co-workers of his. In his recitation of the claimed offending conduct, the principal alleged miscreant was Artur Zbozien. Two incidents of claimed harassment in the plaintiff's telling of it are of pennies thrown at him by Zbozien, Tr. at 37, and of vulgar, anti-Semitic tirades directed at him when he, the plaintiff, while carrying boxes, accidentally bumped into Zbozien, Tr. at 34. Although called to testify years after the event, it is significant to note that each of them had a specific recollection of the "pennies" incident years after they ceased working at Mangia. Swiderski, Tr. at 135; Ubowski, Tr. at 150; and Krajewski, who also specifically recalled the "boxes" incident, Tr. at 117, 118. Theirs was the "glib testimony of school witnesses reciting a lesson," a parody of Wiercinski's. The glaring inconsistencies between their

---

[5] Zelmanovitch and Furman are, as that word is commonly understood, disinterested. They have no private interest in this case; no personal advantage to be gained. Black's Law Dictionary (9th Ed.).

testimony at trial and at depositions years earlier are vital to note for their relevance in arriving at a reasoned and comprehensive disposition of these motions.

Research has failed to unveil a case in which the invocation of the Fifth Amendment led not merely to a seriously erroneous result but to an egregious miscarriage of justice.  If, as Frankfurter's pronouncement that it is the "function of courts of justice to ascertain the truth," <u>Brown</u>, *supra* at 156, or as Justice Stevens stated it in his dissent in <u>Unitherm</u>, *supra* at 407, "The spirit of the Federal Rules of Civil Procedure favors preservation of a court's power to avoid manifestly unjust results," are not to ring platitudinously hollow, a judgment must be entered for the defendant notwithstanding the verdict in this case.  One is driven to conclude that "the privilege was not conceived to give one party in a civil case such an advantage over the other." <u>See</u> Kaminsky, Preventing Unfair Use of the Privilege Against Self-Incrimination in Private Civil Litigation: A Critical Analysis, 39 Brooklyn L.R. 121, 139 (1972).  I quote at some length, Judge Learned Hand's persuasive observation on the issue in <u>United States v. St. Pierre</u>, 132 F.2d 837, 839–40 (2d Cir. 1942), which is exquisitely apt here:

> The law in this country . . . rests upon the obvious injustice of allowing a witness who need not have spoken at all to decide how far he will disclose what he has chosen to tell in part, and how far he will refuse to let his veracity be tested by cross questioning.  In adversary cases it is hard to see how a trial could go on, if this were allowed . . .  It must be conceded that the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; although its exercise deprives the parties of evidence, it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition.

<u>See</u> <u>also</u> <u>Mitchell v. United States</u>, 526 U.S. 314, 321 (1999); Comment, The Privilege Against Self Incrimination in Civil Litigation, 1968 U. Ill. L. Rev. 75, 83 (1968)

("When, however, the defendant is put at a material disadvantage by the plaintiff's use of the privilege and for this reason is not able to present the fullest defense possible, the plaintiff should not be allowed to seek the powers of the court in seeking affirmative relief.").[6]

To enlist the privilege to shield the plaintiff against marring his veneer of veracity is to recall the insightful reflection of Justice Holmes in Hyde v. United States, 225 U.S. 347, 391 (1912): "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time, cease to provoke further analysis."

I have determined that a judgment should be entered for the defendant notwithstanding the verdict (pursuant to Rule 50(b)) because I have a feel of this case that is indelibly engraved upon my consciousness for having seen and heard the witnesses and with an awareness of the nuances of their testimony as described with enviable eloquence in Yutterman v. Sternberg, 86 F.2d 321, 324 (8th Cir. 1936), quoting from Creamer v. Bivert, 214 Mo. 473, 479, 113 S.W. 1118, 1120 (1908):

> The bulk of the testimony was oral. . . [The trial judge] sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page . . . . Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching over-eagerness of the swift witness, as well as

---

[6] The recent decision by the Supreme Court may invite the optimistic possibility that in a case such as this, an exception might yet be carved out. White v. Woodall, _____ U.S. _____ (April 23, 2014).

honest face of the truthful one, are alone seen by him.  In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify.  Therefore, where an issue . . . rests alone on the credibility of witnesses, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact.

In Phelan v. Middle States Oil Corp., 220 F.2d 593, 598 (2d Cir. 1955), Judge

Learned Hand in a similar vein, albeit less floridly, wrote as follows:

We have again and again laid especial weight upon the importance of findings that touch the good faith and honesty of a witness, whom the judge has seen; for, as we have said, on such occasions the printed record does not preserve a part of the evidence, which on that issue is often crucial.  To ascertain anothers motives we are of necessity driven to inferences, for they are never manifest to our senses; no one can see, hear or feel what has actuated someone else.  Among the sensible facts on which we must rely is the manner in which the witness utters his testimony: i.e., his address and bearing, his frankness, his directness and freedom from evasion, his assurance as to what he has personally observed, and his readiness to admit his uncertainty as to what he has not: all these things are among the most convincing means of deciding whether to believe his testimony.  And so, when a judge of tried experience has had the opportunity to observe a person through days of the most searching and provocative cross-examination; and when he has made findings and written an opinion that show the most painstaking and impartial solicitude to reach the truth, his decision about that person's motives is nearly conclusive; and we should disturb it only when the objective circumstances make it clear that the unpreserved evidence could not have properly overbalanced the inherent improbability and inconsistency of his spoken words.

The plaintiff's voluntary request that he be transferred to work for the next five

years of his employment with the defendant, with Zbozien, the man he claims was

ceaselessly subjecting him to the vilest anti-Semitic epithets, Tr. at 100–01, *supra*, would, all of the above aside, virtually compel granting the defendant's motion pursuant to Rule 50(b). His claimed fear of being able to find another job if he left as reason for willingly suffering abuse, was patently false. See pages 9–10, *supra*. "[T]here comes a point where the court should not be ignorant as judges, what we know as men." Watts v. Indiana, 338 U.S. 49, 52 (1940) (Frankfurter, J.).

The foregoing detailed reasons for compelling the Court to conclude that the defendant's Rule 50 motion must be granted, notwithstanding, the Court is also driven to conclude that the verdict is not supportable as a matter of law.

The plaintiff's case was based entirely on his claim that he suffered employment in a hostile work environment imposed upon him by his supervisor. The record plainly reflects, virtually in its entirety, that the offending harasser was Artur Zbozien, who plaintiff claimed was his supervisor. See, e.g., Tr. at 32:23–33:8 (Wiercinski direct examination); id. at 199:15–16 (Zbozien cross-examination). The jury was specifically instructed on two theories of liability—supervisor harassment and co-worker harassment. In its verdict, the jury specifically found that plaintiff was discriminated against by his supervisor, and was not discriminated against by any co-workers.

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." Vance v. Ball State Univ., 133 S.Ct. 2434, 2439 (2013). "Tangible employment action" means action effecting a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 2443

31

(quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

Zbozien was not a supervisor.[7]  There is not a word of evidence suggesting that he had the authority to hire and fire, or evaluate and discipline delivery personnel.  Rather, the evidence is clear and uncontroverted that he was merely a dispatcher who assigned catering orders to individual delivery boys, one of whom was Wiercinski.  Tr. at 49:14–21; 150:16–17; 168:14–22; 189:21–190:7.  Although these assignments could affect the amount earned in tips, this is insufficient to establish "supervisor" status because such assignments do not constitute "tangible employment action."  See, e.g., Anderson v. Wintco Inc., 314 Fed. App'x 135, 138–39 (10th Cir. 2009) (finding that change in employee's shift and job station, which resulted in less tip income, did not constitute a "tangible employment action").  Of the relevant Mangia employees named during the course of the trial, only Cymanow was a supervisor, because she undisputedly had authority to hire and fire employees.  See Tr. at 212:5–6; 215:21–216:6.

The record contains no evidence whatsoever that Cymanow engaged in any discriminatory conduct.  Plaintiff testified only that Cymanow was "known for being anti-Semitic," Trial Tr. at 65:20–21; see also id. at 66:2; id. at 85:1, testimony which was inadmissible hearsay.  He did not testify to any specific conduct of hers directed at him or anyone else that caused him to make that gratuitous accusation, beyond saying that she on occasion used a Polish term that Plaintiff variously characterized as being "not

---

[7] Prior to the Supreme Court's decision in Vance, the Second Circuit employed a more open-ended definition, and had held that a supervisor "has the actual authority to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks."  Mack v. Otis Elevator Co., 326 F.3d 116, 126–27 (2d Cir. 2003).  This Court cited the then-prevailing Mack definition in its June 19, 2012 Memorandum and Order but did not make any determination regarding Zbozien's status, because "[t]he parties do not dispute that Cymanow and Zbozien were plaintiff's supervisors."  Wiercinski v. Mangia 57, Inc., No. 09-cv-4413, 2012 WL 2319142, at *10 n.12 (E.D.N.Y. June 19, 2012).

very derogatory," id. at 65:23, "not nasty," id. at 83:12, and "a rather funny way of talking about Jews," id. at 84:22–23.  Indeed, when cross-examined about the many occasions on which he socialized with a woman he described as a vicious anti-Semite, Plaintiff conceded "[s]o she wasn't anti-Semite.  She was known as being anti-Semite." Id. at 84:25–85:1 (emphasis added).  On the contrary, that she would utter an anti-Semitic remark, was, by her uncontradicted testimony, unthinkable. *Supra*, p. 28.

In the absence of any evidence that Cymanow was in any way responsible for a hostile work environment, the only theory under which her conduct could subject Mangia to liability would be if she failed to intervene or effectively discipline the employees who created the hostile work environment.  See, e.g., MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546 (S.D.N.Y. 2012).  But the verdict conclusively rejects this theory.  The jury specifically found that Plaintiff's supervisor—and only Plaintiff's supervisor—engaged in discriminatory conduct. Cymanow was the only person who, as a matter of law, was a supervisor.  The jury also found that no co-workers engaged in discriminatory conduct.  Accordingly, there was no other employee creating a hostile work environment regarding which Cymanow could have failed to intervene, assuming she was aware of such conduct which she plainly denies.  There was a patent evidentiary vacuum on which the jury's verdict was based. Accordingly, judgment as a matter of law is required.

B.    Motion Pursuant to Rule 59(a) Federal Rules of Civil Procedure

The defendant included with his motion pursuant to Rule 50(b) an alternative or joint request for a new trial under Rule 59.  In accordance with Rule 50(c), having granted the defendant's motion pursuant to Rule 50(b), I must also conditionally rule on

33

the motion for a new trial should the judgment pursuant to Rule 50(b) be vacated or reversed and I turn to that now.

In <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411 (2d Cir. 2012), the Court wrote at 418: "On new trial motions the trial judge may weigh the evidence and credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Although acknowledging that a high degree of deference is accorded to a jury's evaluation of witness credibility, the Court was careful to note at 418, that "we do not mean that a trial judge can never substitute its view of the evidence for that of the jury if the judge is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." Judge Haight stated it thus: "[A] trial judge should be most inclined to disturb a jury's verdict, based entirely or primarily on credibility, where one conflicting account is so inherently implausible as to tax credibility or there is independent evidence in the trial record clearly demonstrating that to believe one party's witnesses over the other's would lead to a miscarriage of justice." <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 70 F. Supp.2d 300, 308 (S.D.N.Y. 1999). For the reason discussed at length in granting the defendant's motion pursuant to Rule 50(b), the Court reiterates its firm conclusion that the jury verdict based entirely on credibility was seriously erroneous and an egregious miscarriage of justice and in doing so, incorporates here the teaching of the cases giving deference to the trial judge's feel of the case which are cited and discussed above.

The defendant's Rule 59 motion must be granted for the additional compelling reason that the award of punitive damages was not only grossly excessive but utterly fails to satisfy any of the criteria courts have traditionally looked to in determining the

reasonableness of punitive damage awards.  In <u>Payne v. Jones</u>, 711 F.3d 85, 93–106 (2d Cir. 2013), Judge Leval authored what could properly be characterized as a concise monograph on the law of punitive damages.  To discuss at any length the principles applicable to this case in his review of them as revealed in countless decisions would be a poorly disguised exercise in plagiarism.  Incorporating here all that I have written above in granting the defendant's Rule 50 motion, a few observations relevant to this issue hopefully will suffice, noting at the outset that on this motion I may properly weigh the evidence which need not be viewed most favorably to the plaintiff and assess the credibility of the witnesses.  Two criteria always considered in determining the sustainability of punitive damages are (1) the degree of reprehensibility of the defendant's conduct, and (2) the ratio between compensatory and punitive damages.

As to the first, to make an award of punitive damages assumes there is a justifiable basis for making it to begin with.  The punitive damages award was against the defendant Mangia.  There isn't a scintilla of evidence that Mangia harbored any malice towards Wiercinski or was recklessly indifferent to the working environment in their facilities.  On the contrary, the uncontradicted evidence was that Wiercinski was a friend of Ms. Cymanow's family for years, was a frequent visitor in her home, invited to participate on festive occasions and was re-hired by her after he was discharged.  That he complained to her about the harassment he was enduring from a co-worker is categorically denied by her and given the uncontradicted testimony in that regard by Mr. Zelmanovich and Mr. Furman, I credit Ms. Cymanow's denial.  That Wiercinski was harassed at all may be doubted given his request that he be assigned to work with the person he alleged was harassing him and continued to work with him for years.

Little need be said about the second criteria—the ratio between compensatory and punitive damages—900,000 to 1!  A citation to cases which would require a finding of a violation of due process given that ratio would be an affectation of research beyond State Farm Automobile Insurance Co. v. Campell, 538 U.S. 408, 410 (2003), in which the Court, although declining to set a bright-line limit, observed that "in practice few awards exceeding a single digit ratio between punitive and compensatory damages will satisfy due process."  A sentence from Judge Leval's opinion in Payne states with crystal clarity the reason which mandates granting this alternative motion for a new trial, viz.: "The customary formulation of the question faced by a federal court in reviewing a jury's verdict for excessiveness has long been whether the amount of the jury's award is 'so high as to shock the judicial conscience and constitute a denial of justice.'" 711 F.3d at 96 (citation omitted).  It does both here.

The defendant has also requested that his motion be granted for conduct of plaintiff's counsel which, he urges, requires that relief.  Much has been written about whether the trial of a case is a sporting event or a search for the truth.  And frequently cited in that connection is Professor Wigmore's belief that cross-examination "is beyond doubt the greatest legal invention ever invented for the discovery of truth," 5 Wigmore § 1367 (Chadbourne ed. 1974).  Many would agree, however, that, as in the view of the Court in this case, cross-examination "made the honest witness hesitant, confused or defiant, and has misled the fact finder to reject truthful evidence."  Uviller, *supra* 42 Duke L.J. at 783.  Bellowing at a witness, for example, "Don't lie to the jury."  Tr. at 219. And more egregious was his summation, telling the jury:

> Counsel started off by questioning Adam's credibility

> and, like I said, there was nothing proven. And what counsel
> doesn't really explain to you is that he is ignoring one person
> in this room, a very powerful person, which is the judge. If
> Adam testifies and gets tripped up by him, by counsel, to
> answer questions about items that have criminal
> ramifications to it, that judge has an obligation to do
> something about it.

Tr. at 279.

The extent to which, if at all, those remarks had an adverse effect on the jury's determination of credibility is uncertain and by themselves do not warrant granting the defendant's motion.

Plaintiff's counsel has also moved this Court for an award of counsel fees which is denied.

## **Conclusion**

The defendant's motion for a judgment pursuant to Rule 50(b) of the Federal Rules of Civil Procedure is granted.

The defendant's motion in the alternative for a judgment pursuant to Rules 50(c) and 59 of the Federal Rules of Civil Procedure is granted.

The motion by plaintiff's counsel for counsel fees is denied.

SO ORDERED.

Dated:      Brooklyn, New York
            April 28, 2014


_____/s/_____
I. Leo Glasser